UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA

| | | |
|---|---|---|
| In re: | ) ) ) | Lead Case No. 1:03-cv-1000 |
| UNUMPROVIDENT CORP. ) ERISA BENEFITS DENIAL ACTIONS | ) ) ) ) | CLASS ACTION MDL Case No. 1:03-md-1552 Judge Curtis L. Collier |

**PLAINTIFFS' CONSOLIDATED
AMENDED CLASS ACTION COMPLAINT**

Plaintiffs, by their attorneys, and for their Consolidated Amended Class Action Complaint, allege the following upon personal knowledge as to themselves and as to all other matters upon information and belief based upon, *inter alia*, the investigation made by and through their attorneys.

**INTRODUCTION**

1.      Defendant UnumProvident Corporation and its insuring subsidiaries named with it as defendants (collectively "UnumProvident" or the "Company"), the leading provider of group disability insurance in the United States, has put into place an elaborate corporate scheme designed to illegally deny or terminate the long-term disability claims of thousands of disabled Americans. UnumProvident has used its scheme to implement insurance claim denials based solely upon financial and budgetary targets, rather than the merits presented by each individual's disability claim. This action has been commenced to stop these illegal and alarming practices and to ensure that past, current and future victims obtain a full and fair review of their claims.

2.      The Employee Retirement Income Security Act of 1974 ("ERISA") was enacted to protect the interests of employees in the administration of their employer's welfare benefit plans.



In addition to conferring numerous rights upon plan participants, ERISA imposes duties upon the people and corporations who are responsible for the operation of such plans. By law, plan fiduciaries are required to discharge their duties prudently, diligently, and solely in the interest of the plan's beneficiaries, for the exclusive purpose of providing promised benefits.

3.      Thousands of employers across the United States sponsor employee welfare benefit plans and hundreds of thousands of employees participate in those plans. Often, long-term disability insurance is part of those plans. Long-term disability insurance provides an employee with income security when he or she becomes disabled due to an injury or illness.

4.      Employers often fund these long-term disability benefits through the purchase of group insurance policies.

5.      After purchasing the insurance, employers routinely delegate their fiduciary duties to the long-term disability insurer that has issued a group policy in connection with the employer's plan. In such a circumstance, the employers allow insurers, such as UnumProvident's subsidiaries, to administer these plans and make critical decisions that affect the lives of some of the most vulnerable American citizens.

6.      UnumProvident has completely ignored the fiduciary duties imposed upon it by ERISA and has actually exploited ERISA through its elaborate, profit-driven scheme. UnumProvident's plan includes a system of financial incentives that it provides to its employees for denying and terminating claims. The company gives bonuses and promotions to employees based upon the number of claims they can deny.

7.      UnumProvident saves money and increases its profits through a scheme that directs

2

its subsidiaries to breach their fiduciary duties.  The Company engages in a variety of abusive

practices, including:

a.  Instituting targets, budgets, or goals for cost-savings to be attained through the denial and termination of claims; the claims do not receive a proper review by a fiduciary and are denied or terminated based upon UnumProvident's financial targets rather than the medical and vocational evidence concerning claimants' disabilities;

b.  Providing financial incentives to in-house physicians who will "rubber stamp" previously made business decisions; the physicians thus ignore their appropriate ethical obligations and overlook strong medical evidence that would ordinarily require a disability claim to be approved;

c.  Implementing of compensation and/or bonus plans that reward Company management for denying or terminating as many claims as possible to meet special financial goals set by the Company;

d.  Authorizing more senior in-house doctors to alter the written reports of other "uncooperative" in-house doctors in order to justify a claim denial or termination;

e.  Creating secret documents for each claim, at the time that claims are filed, that, upon information and belief, sets a target date for cutting off future disability payments; these "Duration Management" documents reflect business decisions made by non-medical claims personnel as to when the company believes claim payments should stop in the future; physicians are not involved in creating these secret documents which are kept outside of the claims file and withheld from claimants, their attorneys, and reviewing courts, and are not produced in discovery during litigation;

f.  Encouraging a game among the in-house physicians called the practice of "insurance medicine"; these in-house physicians are prompted, encouraged, and pressured into (1) changing their valid medical opinions as to a claimant's disability in order to justify a business-driven claim denial; (2) closing their eyes to numerous sources of medical evidence that

support a claimant's disability; (3) remaining quiet about their personal medical opinions that require further analysis, review, testing, and follow up that would reveal the claimant's obvious disability; and (4) putting "canned" statements into their written reports that, on the surface, appear to validate a previous decision by claims personnel to terminate ongoing disability payments to a claimant or to deny a claim in the first instance;

g.    Recruiting claims personnel who have a reputation for "closing claims" (cutting off the ongoing monthly benefits of disabled individuals);

h.    Designing a system in which claimants who have multiple disabling conditions will never receive an integrated overview as to how all of the disabling conditions combine to disable the claimant; by deliberately fragmenting the claim into a number of pieces and preventing a comprehensive review of individuals with "co-morbid" conditions, the Company ensures that the claimant will not receive a comprehensive and fair review of the claim; and

i.    Employing numerous other practices that pressure claims handling personnel into causing claims to be denied or terminated without receiving a proper review.

8.    Thus, by putting its own financial interests above the disabled individuals who have been placed in its trust, UnumProvident has caused egregious and routine breaches of fiduciary duty under ERISA.

**THE PLAINTIFFS AND THE CLASS**

9.    As set forth below in greater detail, plaintiffs Theresa Keir, Michelle Lynn Washington, Karen Gately, Thomas Rocco, Thomas P. Davis, Bruce D. Reitman, Anne Coolidge Gerken, Marvina Jenkins, Edmundo M. Rombeiro, Belinda Contreras, Susan B. Rudrud, Barbara Schwartz, Nina DiPaola, Marcia Harris, and Sharon Dauphinee, are individuals who are insured under group long-term disability benefit plans/policies underwritten and managed by

4

UnumProvident's subsidiaries. They bring this action on behalf of themselves, and on behalf of a nationwide class of similarly situated individuals, as defined below in Paragraph 10 ("Class Members" or "the Class"). Plaintiffs and the Class Members seek declarative, injunctive and other equitable relief under the Employee Retirement and Income Security Act of 1974 [29 U.S.C. § 1132].

10.    Plaintiffs bring this action on behalf of themselves and, under Fed.R.Civ.P.23(a) and (b), as representatives of the Class, defined as:

> All plan participants and beneficiaries insured under ERISA governed long-term disability insurance policies/plans issued by UnumProvident and the insuring subsidiaries of UnumProvident throughout the United States who have had a long-term disability claim denied, terminated, or suspended on or after June 30, 1999 by UnumProvident or one or more of its insuring subsidiaries after being subjected to any of the practices alleged in the Complaint.

## DEFENDANTS

11.    UnumProvident is a publicly owned insurance holding company formed by the June 30, 1999 merger of UNUM Corporation of Portland, Maine and Provident Companies, Inc., of Chattanooga, Tennessee. The merger combined the nation's two leading disability insurers into the largest such insurer of its kind in the United States ("the merger").

12.    Through its subsidiaries, UnumProvident is the industry leader in group long-term disability insurance. UnumProvident has operations throughout the United States, Canada, the United Kingdom, Japan and elsewhere around the world.

13.    UnumProvident is a Delaware corporation with its corporate headquarters in Chattanooga, Tennessee. Since the time of the merger, UnumProvident, through its subsidiaries ("the subsidiaries"), has engaged in the business of administering, providing, and/or underwriting

the long-term group disability policies and claims of thousands of employers and hundreds of thousands of employees throughout all 50 of the United States.

14.    At all times hereinafter mentioned, Defendant The Paul Revere Life Insurance Company was and is an insuring subsidiary of Defendant UnumProvident with a principal place of business in Worcester, Massachusetts.

15.    At all times hereinafter mentioned, Defendant Provident Life and Accident Insurance was and is an insuring subsidiary of Defendant UnumProvident with a principal place of business in Chattanooga, Tennessee.

16.    At all times hereinafter mentioned, Defendant Provident Life and Casualty Insurance Company was and is an insuring subsidiary of Defendant UnumProvident with a principal place of business in Chattanooga, Tennessee.

17.    At all times hereinafter mentioned, Defendant First Unum Life Insurance Company was and is an insuring subsidiary of Defendant UnumProvident with a principal place of business in New York, New York.

18.    At all times hereinafter mentioned, Defendant Unum Life Insurance Company of America was and is an insuring subsidiary of Defendant UnumProvident with a principal place of business in Portland, Maine.

19.    At all times hereinafter mentioned, Defendant Colonial Life & Accident Insurance Company was and is an insuring subsidiary of Defendant UnumProvident with a principal place of business in Columbia, South Carolina.

20.    Defendant J. Harold Chandler was the Chairman, President and Chief Executive Officer of UnumProvident prior to March 2003. Upon information and belief, Defendant Chandler was and is a resident of Chattanooga, Tennessee.

21.    Defendant Thomas J. Watjen was and has been the Chairman, President and Chief Executive Officer of UnumProvident since March 31, 2003.

## JURISDICTION AND VENUE

22.    Jurisdiction is founded on 28 U.S.C. § 1131 and 29 U.S.C. § 1132(e) because the claims herein arise under the Employee Retirement Income Security Act of 1974 [29 U.S.C. §1001 *et seq.*] and the regulations promulgated thereunder.

23.    For pretrial purposes, venue is proper in the Eastern District of Tennessee pursuant to 28 U.S.C. §§1391(b)(1) and (c) and 29 U.S.C. 1132(e)(2) because defendants reside in this judicial district, are subject to personal jurisdiction in this judicial district, and maintain contacts in this judicial district sufficient to subject them to personal jurisdiction.

## THE FIDUCIARIES

24.    ERISA requires every employee welfare benefit plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the Plan" [29 U.S.C. § 1102 (a)(1)]. Either by operation of law or through the implementation of ERISA plan documents, the employers of the plaintiffs and the Class Members delegated their fiduciary responsibility for claims administration to one or more of the subsidiaries, either directly or indirectly.

7

25.     Since the time of the merger, these subsidiaries of UnumProvident have been the fiduciaries that have determined the eligibility of employee plan participants for disability benefits under group insurance policies issued by UnumProvident's subsidiaries or other group insurers that have hired one or more of these subsidiaries as a claim administrator.  Accordingly,  at all relevant times herein, since the time of the merger, UnumProvident's subsidiaries were and are fiduciaries pursuant to ERISA [U.S.C. § 1002 (21)].

26.     At all times relevant to this matter, and in doing the things herein alleged, defendant UnumProvident and each of the other named defendants, were acting as agents of each other, and acting as a joint venture and a combined enterprise.

27.     At all such times since the merger, the claims handling conduct and the claim decisions regarding disability benefits were implemented, coordinated, designed, and instituted by UnumProvident, as the parent company of its subsidiaries, with the explicit purpose of controlling, directing, and/or influencing the subsidiaries to violate ERISA.

## CLASS ACTION ALLEGATIONS

28.     Class Members are numerous and joinder is impracticable.  Plaintiffs believe that there are at least tens of thousands of Class Members.  Their exact number and identities are known to defendants.

29.     Plaintiffs will fairly and adequately protect and represent the interests of the Class. The interests of plaintiffs are coincidental with, and not antagonistic to, those of the Class.

30.     Plaintiffs are represented by counsel who have years of experience in the competent and successful  prosecution of group disability claims that are subject to the provisions of ERISA. Plaintiffs' counsel are experienced in handling large scale, complex litigation, including class actions.

8

31.    The common questions of law or fact as to the violations of ERISA that have caused, and will continue to cause harm to the Class, predominate over questions, if any, that may affect only individual Class Members.

32.    Class action treatment in this matter is a superior method for the fair and efficient adjudication of this controversy, in that such treatment will permit a large number of similarly situated persons to prosecute their common claims, in a single forum, simultaneously, efficiently, and without the necessary duplication of evidence, effort and expense that numerous individual actions would require.

33.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications, with the concomitant risk of the establishment of incompatible and conflicting standards of conduct for defendants.

34.    Adjudication with respect to individual members of the Class could, as a practical matter, be dispositive of the interests of others not parties to the adjudication or substantially impair or impede their ability to protect their interests.

## THE SCHEME TO VIOLATE ERISA

35.    At or around the time of the merger, UnumProvident decided to nationalize many of the cost-cutting techniques that had been previously implemented by two of its subsidiaries; *i.e.*, Provident Life and Accident Insurance Company and Provident Life and Casualty Insurance Company. Former and present employees and corporate officers have testified under oath as to this integration of a national plan to make the Chattanooga claims handling and claim denial scheme the standard and uniform practice throughout the various claims offices of defendants, including the offices in Portland, Maine, Chattanooga, Tennessee, and Worcester, Massachusetts.

36.    Also, on June 13, 2000, Ralph Mohney, a Senior Vice President of UnumProvident, testified before the U.S. Congress Subcommittee on Social Security of the House Committee on Ways & Means that UnumProvident's integrated and uniform claims handling practice is known as its "Claim Management Model." At the time of the merger, UnumProvident's Chief Executive Officer, J. Harold Chandler, publicly announced that UnumProvident would coordinate the management of all of the subsidiaries to form a "combined enterprise." It is this combined enterprise that has been responsible for the conduct delineated herein.

37.    The scheme instituted by UnumProvident included a plan to continue and expand the ongoing practice by the two Provident subsidiaries to exploit ERISA by characterizing as many claims as possible as governed by ERISA and to create an "administrative record" upon a claim denial that could confine the record and withstand the lower level of scrutiny that is applicable in many ERISA actions. The plan included the use of in-house physicians who would assist in the creation of a paper trail in a claim file that would exclude from the record evidence supporting the claim for disability benefits and receive deference by a federal court upon review of a denied claim.

38.    In 1995, the Provident subsidiaries circulated an internal memo touting the profitability of this plan. The memo indicated that claims that would ordinarily receive intense scrutiny in a litigation, resulting in a judgment, verdict or settlement, could instead be summarily denied within the context of ERISA resulting in no claim payments being made at all. The memo discussed how a certain studied group of claims, that resulted in the payment to disabled individuals of $12 million, would have resulted in no payments being made if the claims had been administered under ERISA. The analysis in that memo led UnumProvident to the conclusion that if ERISA governs, the Company could save many millions of dollars by denying such group insurance claims,

10

as long as the *correct* paper trail was created. The claims practices described in this Complaint were designed to create just such a paper trail. In implementing the scheme, however, the Company has ignored the fiduciary obligations imposed by ERISA and has illegally victimized, and continues to victimize, many thousands of disabled Americans.

39.    Rather than faithfully discharging their duties as plan fiduciaries for the exclusive purpose of providing benefits to participants, UnumProvident's subsidiaries, as directed by UnumProvident, operate long-term disability denial factories, efficiently denying and terminating claims, not on the merits of an individual claim but, rather, to satisfy the self-interested financial goals of UnumProvident and other group insurers that have hired UnumProvident and/or its insuring subsidiaries to act as fiduciary/claim administrators.

## IMPLEMENTATION OF THE SCHEME

40.    Most concisely, the scheme was basically a plan to, in the words of UnumProvident's former Vice President and Corporate Medical Director, Dr. William Feist, ". . . find any reason, including illegitimate reasons, to deny existing disability claims."

41.    As will be set forth more fully below, UnumProvident puts the proverbial "cart before the horse" in making its benefit determinations. UnumProvident's non-medical claims personnel first make a business decision to terminate a claim, and subsequently submit the claim file to the in-house medical department for a goal-oriented review of the medical information.

42.    The claims of plaintiffs and the Class Members were reviewed and decided in any one or more of UnumProvident's claims processing units in Chattanooga, Tennessee, Portland, Maine, Chicago, Illinois, Worcester, Massachusetts, Glendale, California, or Tarrytown, New York.

11

UnumProvident's claim denial factory model is uniform in every location where UnumProvident reviews such files and makes such determinations.

43.    When a claim is received by UnumProvident, the medical documentation in support of that claim is reviewed by a triage person, the medical credentials of whom is unknown.

44.    The triage person then determines what Impairment Unit is to be assigned the claim; e.g., General Medical, Orthopedic, Psychiatry, Cardiology, or Cancer.

45.    If claimant has more than one disabling condition ("comorbidity"), the claim would, nonetheless, only be evaluated for one medical condition in only one of those discrete Impairment Units.

46.    Once the Plan Participant's claim is assigned to a discrete Impairment Unit, a Customer Care Specialist, with no medical training, assumes the control of the claim and generates a "Duration Management Document." The Duration Management Document sets forth the date on which the disabled person is expected to recover and is generated prior to any in-house professional medical review of the file.

47.    Upon information and belief, plaintiffs allege that UnumProvident utilizes the recovery dates set forth in the Duration Management Documents to calculate its future monthly financial exposure and to set target dates for claim denials.

48.    The Duration Management Document exists only in defendants' electronic files, and defendants forbade its printing and placement in a claimant's file. Thus, it is secreted from review by outsiders to the Company. When an ERISA claimant or his or her attorney makes a request to review all of the documents in UnumProvident's claim file pursuant to the provisions of ERISA, this

business-oriented document, which is geared toward cutting off benefits at a specific time in the future, is kept secret.

49.     In addition, defendants forbid the printing of electronically-kept Customer Profile/Account Management Database Documents or their subsequent placement into a claimant's file, and thus they are secreted from review by outsiders to the Company, including claimants, their counsel, and reviewing courts. When an ERISA claimant or his or her attorney makes a request to review all of the documents in UnumProvident's claim file pursuant to the provisions of ERISA, this business-oriented document is kept secret.

50.     In order to maintain or increase its profits, UnumProvident provides its financial targets each month to its Impairment Heads. Upon information and belief, UnumProvident utilizes its potential monthly exposure to calculate a monthly budget of available funds to make ongoing disability payments.

51.     The Impairment Heads, in turn, advise their Claims Consultants and Customer Care Specialists of the monthly sum available for payments for a particular month by means of team meetings, memos or by "white boards." The Customer Care Specialists then review their claim files to determine how many claims they must terminate to meet these financial goals.

52.     Claims with a higher monthly benefit receive greater consideration for termination.

53.     Claims, especially those with a higher dollar value, are subjected to internal review committees, colloquially called "round tables," or "scrub process" review groups, or other *ad hoc* committees, designed to terminate or deny claims to achieve financial savings quotas for the Company that had been previously targeted.

54.     The Customer Care Specialists indicate their projected contributions to the budgeted amount by means of a memo outlining various pending claims and the amount of money that can be saved if the claim is "closed" (cutting off monthly benefits to the disabled individual). The memo is then provided to that Customer Care Specialist's assigned Claim Consultant.

55.     The Impairment Heads' annual bonuses, through a Management Incentive Compensation Plan, are based on their "productivity" in denying claims.

56.     A Customer Care Specialist's ability to efficiently terminate claims affects his or her promotional opportunities within UnumProvident.

57.     On many occasions, before a claim file, with its attendant medical history, is submitted to an in-house medical doctor, UnumProvident has already decided to deny or terminate the claim. After a Customer Care Specialist decides to deny or terminate a claim, the Customer Care Specialist or the Claim Consultant meets with a UnumProvident nurse who recommends a claim denial or termination. The nurse reviews the file, writes that a denial or termination is recommended, and then presents the file to one of UnumProvident's in-house medical doctors.

58.     The Customer Care Specialists, with no medical training, only present the nurses with those portions of the medical records that the Customer Care Specialist deems relevant. Other pertinent records are kept from review by the nurse and, subsequently, the doctor.

59.     UnumProvident's in-house nurse is the first medical professional to review the file after the decision has been made to deny or terminate a plan participant's claim.

60.     UnumProvident's in-house nurses review and summarize the medical records in every file before it is presented to an in-house medical doctor, along with a recommendation to terminate the claim.

14

61.    UnumProvident's in-house nurses' promotional opportunities are determined by their ability to review as many medical files as possible.

62.    UnumProvident's in-house medical doctors rely on the in-house nurses' summary of the relevant medical records to conduct an expeditious review of a claim.

63.    The in-house nurses' failure to review and summarize all of a claimant's medical records make it impossible for a claimant to get a full and fair review of the claim by UnumProvident's in-house medical doctors.

64.    UnumProvident in-house nurses are vested with the sole discretion to determine what medical specialist can review a file.

65.    UnumProvident's in-house medical doctors' performance review and, ultimately, their bonus is based on the amount of files that they can review per day.

66.    UnumProvident's in-house medical doctors, in order to achieve higher review rates, do not actually review a claimant's medical records. Rather, they rely upon the nurses' summary and recommendation and "sign off" on a claim denial or termination. This "sign-off" confirms the claim determination of the Customer Care Specialist whose promotional prospects are directly related to the number of claims he or she can deny or terminate.

67.    A former Associate Medical Director of UnumProvident, Dr. Patrick McSharry, has testified under oath that "sign-offs" were frequent and illegal, blatantly contradicting the ERISA statutory scheme.

68.    If UnumProvident's in-house doctors refuse to "sign-off" on the decisions of the Customer Care Specialists, their superiors threaten their career paths.

15

69.    If UnumProvident's in-house doctors refuse to "sign-off" on the decisions of the Customer Care Specialists, they are chastised by their co-workers.

70.    If UnumProvident's in-house doctors regularly refuse to "sign-off" on the decisions of the Customer Care Specialists, that Customer Care Specialist, or the in-house nurse, shops for a "compliant" in-house medical doctor who will "sign-off" on the desired determination.

71.    The in-house medical doctor's initial evaluation and report are not kept in the claimant's file and, thus, are illegally secreted from a claimant when that claimant requests a review of his or her claim file pursuant to 29 CFR 2560.503-1 (g)(1)(ii).

72.    Disturbingly, defendants destroy records of in house medical staff which support the insureds' claim for disability. In fact, a Federal Court has concluded that defendants have admitted to such practices as destruction of original medical reports from examining physicians.

73.    UnumProvident's in-house medical doctors are instructed to couch their medical opinions in certain language to avoid compromising the adverse benefit determinations of claims personnel.

74.    In fact, if an in-house medical doctor determines that a claimant's restrictions and limitations are supported by his medical history, his or her written medical opinion is changed to reflect that the restrictions and limitations are not supported by "objective medical evidence."

75.    UnumProvident's in-house doctors are instructed to disregard their independent medical knowledge when examining the medical records in a claimant's file. Rather, they are instructed to review the file solely for "objective" proof of the disability from the claimant's physicians, even if the in-house doctor clearly sees a misdiagnosis, error, or other information favorable to a determination of disability.

16

76.    When UnumProvident's in-house doctors cannot make a determination of disability from the medical records in the claim file, they are prohibited from requesting further medical information or suggesting that further testing needs to be done in order to evaluate whether a claimed impairment exists.

77.    It is within the sole discretion of claims personnel, with no medical training, to authorize further medical testing.

78.    When an in-house medical doctor finds a reference to the existence of another treating physician in a claimant's medical records, UnumProvident forbids its in-house doctors from requesting those medical records when those other physicians are in a better position to diagnose the injury or illness.

79.    Because of UnumProvident's deliberate fragmentation of its impairment evaluation scheme, UnumProvident's in-house doctors are unable to fully assess the multiple impairments of comorbid claimants to arrive at that claimant's cumulative restrictions and limitations. Thus, if a claimant suffers from two or more impairments which independently would not render the claimant disabled, his or her claim is denied or terminated, even though the cumulative impairments render the claimant disabled.

80.    UnumProvident's in-house doctors who have a reputation for carefully scrutinizing medical evidence are excluded from their Impairment Unit's monthly roundtable meetings where claim denial or termination decisions are made.

81.    UnumProvident's Customer Care Specialists quote in-house medical doctors' opinions out of context to deny or terminate a claim, even where that doctor fully retracts his or her statements.

82.    Customer Care Specialists ignore medical opinions when they are supportive of a claim and determination of disability.

83.    UnumProvident's Customer Care Specialists walk in to in-house medical doctors unannounced to ask that doctor pointed questions regarding medical portions of a claimant's claim file that he or she does not understand.  The in-house doctor writes a brief opinion, known as a "walk-in," based on his or her limited review of the medical file.  That opinion is then used by the Customer Care Specialist to deny or terminate a claim.

84.    UnumProvident also employed various forms of incentive fees and awards, including one known as the "Hungry Vulture Award," an engraved glass trophy bearing the legend: "Paitence my foot. I'm going to kill something," to improperly motivate the denial or termination of legitimate claims.

85.    ERISA requires UnumProvident to discharge its fiduciary duties with respect to a plan solely in the interest of the participants and beneficiaries and with utmost, undivided loyalty to their interests.

86.    By implementing a profit-motivated claim review factory, whose assembly line ends, ultimately, in the termination of valid claims, UnumProvident has breached, and continues to breach, its fiduciary obligations to plaintiffs and the Class Members.

87.    The scheme and system described above has deprived, and continues to deprive, plaintiffs and the Class Members from receiving a full and fair review of their claims by a fiduciary that properly discharges its obligations under ERISA.

88.    In addition, UnumProvident's Customer Care Specialists discourage plan participants from appealing UnumProvident's initial adverse benefit determinations to prevent them from

exhausting their administrative remedies under ERISA and thus preclude them from bringing legal and equitable actions against UnumProvident's subsidiaries.

89.     Moreover, subsequent to UnumProvident's initial adverse benefit determination, its Customer Care Specialists encourage implacable plan participants to file *de minimis* appeals to ensure that the claim denial is upheld on appeal and to limit the administrative record before a court in a subsequent legal action.

## FACTUAL BACKGROUND OF THE CLAIMS

### Theresa Keir

90.     During her employment with a real estate company, Cushman & Wakefield Inc., plaintiff Theresa Keir became insured under a group long-term disability policy issued by UNUM to Cushmman & Wakefield Inc., for Ms. Keir's benefit.

91.     On or about March 3, 2000, Ms. Keir became disabled due to chronic pain arising out of breast cancer surgeries in both her left and right breasts, L-5, L-4, S-1 spinal fusions, removal of a precancerous ovarian cyst, dermatomyocitis, two herniated discs in her neck, and fibromyalgia.

92.     At the time of the commencement of her disability, Ms. Keir was a financial systems analyst with Cushman & Wakefield, Inc.

93.     UnumProvident caused Ms. Keir's claim for long-term disability benefits to be denied in or about December 2000, based upon an  in-house medical department review of her medical records.

94.     By correspondence dated in or about February 2001, Ms. Keir appealed UNUM's initial adverse long-term disability benefit determination pursuant to 29 C.F.R. § 2560.503-1(g).

95.    In her appeal, Ms. Keir conclusively demonstrated that she satisfied the definition of disability set forth in her group policy.

96.    By way of a decision on review, in or about July 2001, UnumProvident caused the previous adverse benefit determination to be upheld, based on its medical department's review of her file.

97.    Upon information and belief, UnumProvident's formulation, implementation and application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Ms. Keir in violation of ERISA.

**Michelle Lynn Washington**

98.    On or about March 11, 1996, plaintiff Michelle Lynn Washington became employed as an attorney with the law firm of Schulte Roth & Zabel LLP ("Schulte Roth").

99.    During her employment with Schulte Roth, Ms. Washington became insured under a group long-term disability policy issued by First UNUM Life Insurance Company, a UnumProvident subsidiary.

100.    On May 29, 1998, Ms. Washington became disabled from mitral valve prolapse, iron deficiency, anemia, hypothyroidism, cervical discogenic disease, cervical myofascial pain, L-5 radiculopathy, fibromyalgia, and depression, as well as their well-documented sequelae.

101.    From on or about September 9, 1998 through on or about June 27, 2001, First UNUM appropriately paid Ms. Washington her long-term disability benefits.

102.    UnumProvident caused the termination of Ms. Washington's benefits on or about June 27, 2001 based upon an in-house medical review which purportedly determined that Ms. Washington should be able to resume full time employment as an attorney.

103.    By correspondence dated July 21, 2002, Ms. Washington appealed the initial adverse long-term disability benefit determination  pursuant to 29 C.F.R § 2560.503-1(g).

104.    In her appeal, Ms. Washington conclusively demonstrated that she satisfied the definition of disability set forth in her group policy.

105.    By way of a decision on review dated August 30, 2001, UnumProvident caused the previous adverse benefit determination to be upheld.

106.    The basis for the adverse decision on review was UnumProvident's in-house medical department's purported determination that the restrictions and limitations placed upon Ms. Washington by her primary treating physician were overly excessive and that she should be able to perform the job duties of an attorney on a full time basis.

107.    Upon information and belief, UnumProvident's formulation, implementation and application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Ms. Washington in violation of ERISA.


**Karen Gately**

108.    On September 12, 1983, plaintiff Karen Gately became employed as a registered nurse with the North Shore-Long Island Jewish Health System, at Long Island Jewish Medical Center ("LIJ") in New York.

109.    During her employment with LIJ, Ms. Gately became insured under group long-term disability policy number issued by First UNUM Life Insurance Company, a subsidiary of UnumProvident.

21

110.    On August 1, 1995 Ms. Gately became disabled due to fatigue, loss of balance, joint pain and swelling, short term memory loss, and confusion, arising out of her contracting lyme disease.

111.    First UNUM appropriately paid Ms. Gately her long-term disability benefits from on or about January 27, 1996 through on or about November 29, 2001.

112.    UnumProvident caused the termination Ms. Gately's benefits on or about November 29, 2001 alleging that the information in her file indicated that there was no "objective" data regarding her Epstein Barr virus, lyme disease, chronic fatigue, and cognitive dysfunction.

113.    By correspondence dated May 9, 2002, Ms. Gately appealed the initial adverse long-term disability benefit determination, pursuant to 29 C.F.R § 2560.503-1(g).

114.    In her appeal, Ms. Gately conclusively demonstrated that she satisfied the definition of disability set forth in her group policy.

115.    By way of a decision on review dated July 8, 2002, UnumProvident caused the previous adverse benefit determination to be upheld.

116.    The basis for the adverse decision on review was UnumProvident's in-house medical department's purported determination that her well-documented symptoms were not supported by objective evidence.

117.    Upon information and belief, UnumProvident's formulation, implementation and application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Ms. Gately in violation of ERISA.

**Thomas Rocco**

22

118.    Plaintiff Thomas Rocco became employed with Oppenheimer & Co., Inc. in or about 1986. Mr. Rocco then became an employee of the Canadian Imperial Bank of Commerce ("CIBC") as a result of its purchase of Oppenheimer & Co. Inc. in or about November 1997.

119.    During his employment with CIBC, Mr. Rocco became insured under a group long-term disability policy issued by Provident Life and Casualty Insurance Company, a subsidiary of UnumProvident.

120.    On or about February 2, 2000, Mr. Rocco became disabled due to the symptoms arising out of his Meniere's disease, chronic obstructive pulmonary disease, diabetes mellitus II, hearing loss, and anxiety disorder.

121.    Provident paid Mr. Rocco his long-term disability benefits from in or about September 2000 through on or about May 30, 2001.

122.    UnumProvident caused a termination of Mr. Rocco's claim on or about May 31, 2001, based upon its in-house medical department's review of Mr. Rocco's claim file.

123.    By correspondence dated November 19, 2001, Mr. Rocco appealed the initial adverse long-term disability benefit determination pursuant to 29 C.F.R. § 2560.503-1(g).

124.    In his appeal, Mr. Rocco conclusively demonstrated that he satisfied the definition of disability set forth in his group policy.

125.    By way of a decision on review dated on or about February 20, 2002, UnumProvident caused the prior adverse benefit determination to be upheld based on its in-house medical department's review of additional medical evidence submitted in support of Mr. Rocco's appeal.

126.    Upon information and belief, UnumProvident's formulation, implementation and

application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Mr. Rocco in violation of ERISA.

**Thomas P. Davis**

127.    Plaintiff Thomas Davis became employed for Glaxo and its predecessor, SmithKline Beecham, ("GlaxoSmithKline") as a Product Safety Reporting Associate in April 1987.

128.    During his employment with GlaxoSmithKline, Mr. Davis became insured under a group long-term disability policy issued by Prudential Insurance Company ("Prudential"), and thereafter, The Hartford ("Hartford").

129.    On July 16, 1991, Mr. Davis became disabled with labyrinth dysfunction, producing balance and reading disabilities.

130.    Prudential, and subsequently Hartford, approved and paid long-term disability payments until UnumProvident, as substituted administrator, terminated his benefits on or about February 13, 2001.

131.    Mr. Davis' disabling condition did not significantly change during the time his disability payments were approved and paid by Prudential and Hartford, and his condition has not significantly changed to date.

132.    Within the past 45 days, UnumProvident agreed to reinstate Mr. Davis' benefits.

133.    Notwithstanding, upon information and belief, UnumProvident's formulation, implementation and application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Mr. Davis in violation of ERISA.

**Bruce D. Reitman**

24

134.    Plaintiff Bruce Reitman was employed by The Centers for Dialysis Care ("CDC") as dialysis technician.

135.    During his employment with CDC, Mr. Reitman became insured through a group policy administered by UnumProvident.

136.    Despite struggling with multiple sclerosis, Mr. Reitman continued to work periodically as long as he could, receiving benefits to off-set the loss opf income during periods when he was unable to work because of his medical condition.

137.    On or about April 2, 2001, UnumProvident terminated Mr. Reitman's benefits, stating that it could "find no explanation" for his "recent exacerbation" of increased fatigue which caused him to be unable to perform the 20-30 hours per week he had been working.

138.    UnumProvident ignored the reports of treating physicians and the progressive nature of Mr. Reitman's disease.

139.    Upon information and belief, UnumProvident's formulation, implementation and application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Mr. Reitman in violation of ERISA.

**Anne Coolidge Gerken**

140.    Plaintiff Ann Coolidge Gerken, a long-time, valued and trusted employee, became employed by UnumProvident as a mid-level executive in 1992.

141.    During her employment with UnumProvident, Ms. Gerken was became insured by the Company's group long-term disability policy.

142.    In 1999, Ms. Gerken suffered the onset of clinical depression and was unable to perform her duties.

25

("Next Level") as a mechanical technician.

151.    During his employment with Next Level, Mr. Rombeiro became insured under a group long-term disability policy issued by UNUM and UnumProvident to Next Level, for Mr. Rombeiro's benefit.

152.    On or about May 16, 2000, Mr. Rombeiro suffered from severe, debilitating, uncontrolled diabetes, reaching a glucose count of 710 (normal range being between 70-115), and suffered consequent effects, including permanent diabetic neuropathy (loss of feeling and coordination of extremities), blurred vision, dizziness, severe fatigue, and nerve damage.

153.    Subsequently, Mr. Rombeiro's physician forwarded his written medical opinion that Mr. Rombeiro was disabled as his condition rendered him unable to safely perform his usual occupation.

154.    Despite his verified and serious condition, UnumProvident denied Mr. Rombeiro's request for benefits under his plan and informed him that coverage under his policy would be terminated.

155.    On or about October 29, 2001, UnumProvident terminated Mr. Rombeiro's coverage.

156.    Upon information and belief, UnumProvident's formulation, implementation and application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Mr. Rombeiro in violation of ERISA.

**Susan B. Rudrud**

157.    Plaintiff Susan Rudrud was employed by Reliastar Financial Corporation ("Reliastar") as a Second Vice President of the Retirement Plan Division.

158.    During her employment, Ms. Rudrud became insured under a group long-term

27

disability policy issued by The Paul Revere, a subsidiary of UnumProvident, to Reliastar for Ms. Rudrud's benefit.

159.    In 1993, Ms. Rudrud began experiencing flu-like symptoms and fatigue. Eventually, she was diagnosed with fibromyalgia, chronic fatigue syndrome, and post-viral asthenia.

160.    In May 1996, Ms. Rudrud's condition forced her to stop working. She then received short term disability benefits though her employer until August 1996.

161.    Between August 13, 1996 and September 9, 1996, Ms. Rudrud again attempted to work on a part-time basis, however, such attempts were unsuccessful and she ceased working again on September 10, 1996.

162.    Thereafter, Ms. Rudrud applied for and was approved for long-term disability payments through Paul Revere and began receiving such benefits as of November 9, 1996.

163.    Despite her documented history, unchanged condition, and entitlement to benefits, by letter dated April 9, 2001, Ms. Rudrud was notified by UnumProvident that her benefits were being terminated because she no longer met the definition for either total or residual disability under her plan.

164.    By correspondence dated May 15, 2001, Ms. Rudrud filed an appeal of the termination of her benefits with medical documentation conclusively establishing that she satisfied the definition of disability set forth in her group policy.

165.    By way of a decision on review, dated September 18, 2001, UnumProvident caused the previous adverse benefit determination to be upheld.

28

166.    Further, UnumProvident maintained its position that Ms. Rudrud was not disabled from a medical standpoint and that her claim was being reclassified as a claim for benefits due to mental disability -- a claim limited to 24 months under her plan.

167.    Ms. Rudrud never listed a mental or nervous condition as a basis for her claim and no medical documentation was ever submitted by Ms. Rudrud's physicians, or from any other source, indicating that Ms. Rudrud suffered from a mental or nervous condition.

168.    On or about December 7, 2001, Ms. Rudrud submitted a second appeal, again attaching supporting documentation of her true condition. By letter dated January 30, 2002, UnumProvident informed Ms. Rudrud that their prior decision was being upheld and that she had exhausted her administrative remedies.

169.    The administrative claim file produced by UnumProvident on Ms. Rudrud's case indicated that her claim was subjected to the dubious roundtable process and reviewed by Dr. Patrick F. McSharry, who previously testified about UnumProvident's abusive claims practices and that such practices prevented him from fully and fairly evaluating the disability claims he reviewed.

170.    Upon information and belief, UnumProvident's formulation, implementation and application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Ms. Rudrud in violation of ERISA.

**Barbara Schwartz**

171.    Plaintiff Barbara Schwartz became an employee of Fairview Hospital at the Fairview University Medical Center as a registered nurse in Healthcare Services in July 1995.

29

172.     During her employment at Fairview Hospital, Ms. Schwartz became insured under a group long-term disability policy issued by UNUM Life, a UnumProvident subsidiary, to her employer for her benefit.

173.     In 1996, Ms. Schwartz began experiencing symptoms of nausea, vomiting, diarrhea and gastrointestinal bleeding with severe abdominal pain. Ms. Schwartz has been hospitalized on several occasions from October 1996 to the present for these conditions.

174.     Between December 29, 1996 and February 4, 2000, Ms. Schwartz made a number of attempts to return to work but was unable to do so for any significant period of time. During this time, Ms. Schwartz received disability payments through her long-term disability plan.

175.     On February 4, 2000, Ms. Schwartz, unable to continue working on any basis, ceased working entirely. Thereafter, UnumProvident approved and paid disability benefits to Ms. Schwartz.

176.     On August 1, 2000, UnumProvident abruptly terminated Ms. Schwartz's benefits claiming that Ms. Schwartz was not receiving regular care for her disabling condition as required by her policy. Her policy defined "regular care" as the amount "you personally visit a doctor as frequently as is medically required, according to standard medical practice, to effectively manage and treat your disabling condition(s); and you are receiving appropriate treatment and care of your disabling condition(s) by a doctor whose specialty or experience is appropriate for your disabling condition(s)."

177.     Despite Ms. Schwarz providing UnumProvident with sufficient medical documentation establishing she met the definition of "disabled" under her plan and that she was receiving regular care for her condition by a physician, UnumProvident upheld its termination of benefits decision.

30

178.    The administrative claim file produced by UnumProvident on Ms. Schwartz's case indicated that her claim was subjected to the dubious and abusive roundtable process.

179.    Upon information and belief, UnumProvident's formulation, implementation and application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Ms. Schwatz in violation of ERISA.

**Sharon Dauphinee**

180.    Plaintiff Sharon Dauphinee was employed by Eastern Maine Medical Center as a registered nurse and became insured under a group long-term disability policy issued by UNUM, a UnumProvident subsidiary, to her employer for her benefit.

181.    In 1998, after working for years with chronic back pain, the condition became an impediment to her being able to fulfill her duties. MRI images taken in December 1998 showed that Ms. Dauphinee had severe disk degeneration, most notably at the L4-5 level.

182.    Shortly after the MRI study, Mr. Dauphinee could no longer work and was forced to leave her long-term career as a nurse. Although she desired to work she could no longer function as a nurse and was not skilled for any other profession. Consequently, she applied and was approved for long-term disability benefits under her plan.

183.    On September 30, 2002, Ms. Dauphinee's benefits were abruptly terminated by letter from UnumProvident. In the letter, UnumProvident informed Ms. Dauphinee that she was fit to resume her occupation as a nurse "as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer at a specific location."

184.    Paradoxically, nursing, as it is generally performed, involves a great deal of physical labor, including walking, lifting, assisting patients in transfers and ambulation, as well as many other

31

active duties. UnumProvident, however, went on to narrowly define nursing as involving purely sedentary duties in order to reach the conclusion that she could return to work.

185.    UnumProvident referred to a video illustrating Ms. Dauphinee engaged in certain daily activities and, without any medical support or other information, concluded that Ms. Dauphinee was "comfortably" conducting her activities. In reality, the video shows little more than Ms. Dauphinee walking very slowly and getting into her car, slowly and carefully. On this basis, UnumProvident terminated a disabled and aging woman's long-term benefits.

186.    Upon information and belief, UnumProvident's formulation, implementation and application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Ms. Dauphinee in violation of ERISA.

**Nina DiPaola**

187.    Plaintiff Nina DiPaola was employed by Morgan Stanley and insured under a group long-term disability policy issued by a UnumProvident subsidiary, to her employer for her benefit.

188.    During the course of her employment, Ms. DiPaola developed chronic fatigue syndrome which left her in a profound state of fatigue on many sequential days, such that she frequently could not work, let alone get out of her bed.

189.    On March 3, 2000, UnumProvident accepted Ms. DiPaola's initial benefit claim and began paying her monthly benefits dating back to August 8, 1999.

190.    Ms. DiPaola's condition never improved yet, after approximately two years of receiving benefits, Ms. DiPaola's benefits we abruptly terminated.

191.    UnumProvident did not obtain updated medical records ro seek further information on Ms. DiPaola's condition, it merely based its decision on her prior records which were previously

32

approved for disability benefits.

192.    Upon information and belief, UnumProvident's formulation, implementation and application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Ms. Dipaola in violation of ERISA.

**Marcia Harris**

193.    Plaintiff Marcia Harris became employed by the Franklin-Williamson Health Service, Inc. in February 1978 and, at the time of her disability, was employed as a director of development and marketing.

194.    During the course of her employment, Ms. Harris became insured under a group long-term disability policy issued by a UnumProvident subsidiary, to her employer for her benefit.

195.    On or about June 26, 2000, Ms. Harris became disabled and was unable to continue employment as she was suffering from fibromyalgia, lumbosacral spondylosis, chronic fatigue, chronic anemia, primary hypothyrodism, osteoperosis, major recurrent depression and attention deficit disorder. She also suffered from post-traumatic stress disorder as a result of sexual harassment by a union representative.

196.    As a result of her condition, Ms. Harris went on extended medical leave until March 2001, at which time she was terminated based upon the diagnosis of her treating physician, Dr. Enzenauer, who determined, based on his medical experience, that Ms. Harris would be unable to return to work for the foreseeable future.

197.    On June 20, 2001, UnumProvident denied Ms. Harris application for benefits based

33

upon an in-house review of her medical records. On August 14, 2001, Ms. Harris wrote to UnumProvident stating her intention to appeal the denial of benefits pursuant to 29 C.F.R. §2560-503-1(g). Her letter contained information and records demonstrating that she satisfied the definition of disability as set forth in her plan.

198.    By letter of January 17, 2202, Cherie T. Gann, Lead Appeal Specialist for UnumProvident, denied Ms. Harris' appeal, upholding the denial of benefits decision. In the letter, Ms. Gann wrote, "Please be advised that you were paid with a reservation of right and received $22,502.68 in disability and 401(k) benefits of which you were not entitled. At this point, we will not request repayment of this money, however, we reserve the right to request the same at a later date at our discretion."

199.    Upon information and belief, UnumProvident's formulation, implementation and application of the foregoing uniform offending claims practices has caused, and continues to cause, harm to Ms. Harris in violation of ERISA.

200.    Plaintiffs have exhausted their administrative remedies under ERISA.

## COUNT ONE

### (Against All Defendants)

### Breach of Fiduciary Duty Under ERISA

201.    Plaintiffs and the Class Members repeat and reallege the foregoing paragraphs as though fully set forth herein.

202.    Each of the defendants was and is a fiduciary within the scope of ERISA [29 U.S.C. § 1002(21)(A)(iii) ] by virtue of its/his exercise of discretionary authority, control and responsibility over the design, implementation and administration of UnumProvident's uniform claim

34

management model, during the relevant time period herein alleged. By virtue of the conduct described above, UnumProvident has caused, directed and/or improperly influenced its subsidiaries to breach, and the insuring subsidiaries and the individual defendants have breached their fiduciary obligations to plaintiffs and the Class Members under ERISA [29 U.S.C. § 1104(a)] to discharge their duties "solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries . .. with the care, skill, prudence, and diligence . . . [of a] prudent man . . . and in accordance with the documents and instruments governing the plan . . . ."

203.    By managing, operating and administering ERISA governed plans in the manner described above, UnumProvident has failed to exercise the utmost loyalty and care of an ordinary prudent person engaged in a similar activity under prevailing circumstances, all in violation of ERISA [29 U.S.C. § 1104(a)(1)(B)].

204.    By causing its insuring subsidiaries to uniformly implement and apply the foregoing offending claims practices, UnumProvident has caused a substantial failure of these subsidiaries to discharge their fiduciary duties in accordance with plan documents and ERISA's legislative scheme. UnumProvident has knowingly participated in these fiduciary violations.

205.    Under Section 405(a) of ERISA, 29 U.S.C. § 1105(a), each defendant fiduciary is jointly liable with each other fiduciary for these violations, in that each defendant participated in and was in a position to prevent or restrain the violations, or to disclose the violations to appropriate enforcement authorities such as the U.S. Department of Labor, state insurance commissioners, and federal and state criminal authorities.

206.    As a result of the breaches of fiduciary duty as described above, plaintiffs and the Class Members have been harmed, continue to be harmed, and will be harmed in the future, due to the acts or omissions detailed above.

207.    As participants, beneficiaries, or assignees in ERISA governed benefit plans, plaintiffs and the Class Members are entitled to appropriate equitable relief under ERISA [29 U.S.C. § 1132(a)(3)] to (a) obtain appropriate injunctive relief immediately stopping the offending and egregious practices that are causing ongoing harm to plaintiffs and the Class Members, and (b) redress the violations of §1104 set forth herein.

208.    Plaintiffs and the Class Members do not have an adequate remedy at law.

## COUNT TWO

### (Against J. Harold Chandler and Thomas J. Watjen)

### Breach of Fiduciary Duty Under ERISA

209.    Plaintiffs and the Class Members repeat and reallege the foregoing paragraphs as though fully set forth herein.

210.    Upon information and belief, defendants Chandler and Watjen were and are fiduciaries within the scope of ERISA [29 U.S.C. § 1002(21)(A)(iii) ] by virtue of their exercise of their discretionary authority, control and responsibility over the design, implementation and

administration of UnumProvident's uniform claim management model, during the relevant time period herein alleged.

211.    Upon information and belief, at Chandler's and Watjen's direction, UnumProvident has caused, directed and/or improperly influenced its subsidiaries to breach their fiduciary obligations to plaintiffs and the Class Members under ERISA [29 U.S.C. § 1104(a)] to discharge their duties "solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries . . . with the care, skill, prudence, and diligence . . . [of a] prudent man . . . and in accordance with the documents and instruments governing the plan . . . ."

212.    By directing UnumProvident's insuring subsidiaries to uniformly implement and administer ERISA governed plans in the manner described above, defendants Chandler and Watjen failed to exercise the duty of utmost loyalty and the duty of care of an ordinary prudent person engaged in a similar activity under prevailing circumstances, all in violation of ERISA [29 U.S.C. § 1104(a)(1)(B)].

213.    Under Section 405(a) of ERISA, 29 U.S.C. § 1105(a), each defendant fiduciary is jointly liable with each other fiduciary for these violations, in that each defendant participated in the violations and was in a position to prevent or restrain the violations, or to disclose the violations to appropriate enforcement authorities such as the U.S. Department of Labor, state insurance commissioners, and federal and state criminal authorities.

214.    As a result of the breaches of fiduciary duty as described above, plaintiffs and the Class Members have been harmed, continue to be harmed, and will be harmed in the future, due to the acts or omissions detailed above.

37

215.   As participants, beneficiaries, or assignees in ERISA governed benefit plans, plaintiffs and the Class Members are entitled to appropriate declaratory and equitable relief under ERISA [29 U.S.C. § 1132(a)(3)] to (a) obtain appropriate injunctive relief immediately stopping the offending and egregious practices that are causing ongoing harm to plaintiffs and the Class Members and (b)  redress the violations of §1104 set forth herein.

216.   Plaintiffs and the Class Members do not have an adequate remedy at law.

**COUNT THREE**

**(Against All Defendants)**

**Violation of 29 C.F.R. § 2560.503-1 (b)(iii)(1984)**

217.   Plaintiffs and the Class Members repeat and  reallege the foregoing paragraphs as though fully set forth herein.

218.   By virtue of the conduct described above, UnumProvident has wilfully caused, directed and/or improperly influenced its subsidiaries to engage in, and the insuring subsidiaries have engaged in unreasonable claims procedures in contravention of the proscriptions of ERISA, and the regulations promulgated thereunder [29 C.F.R. §2560.503-1(1)(b)(iii)(1984)], which prohibit conduct that unduly inhibits or hampers the fair and scrupulously faithful processing of claims.

219.   As a result of the unreasonable claims procedures described above, plaintiffs and the Class Members have been harmed, continue to be harmed, and will be harmed in the future.

220.   As participants, beneficiaries, or assignees in ERISA governed benefit plans, plaintiffs and the Class Members are entitled to appropriate declaratory and equitable relief under ERISA [29 U.S.C. § 1132(a)(3)] to (a) obtain appropriate injunctive relief immediately stopping the

38

offending and egregious practices that are causing ongoing harm to plaintiffs and the Class Members, and (b) redress the violations of ERISA[29 C.F.R. §2560.503-1] set forth herein.

221.    Plaintiffs and the Class Members do not have an adequate remedy at law.

## COUNT FOUR

### (Against All Defendants)

### Violation of 29 C.F.R. § 2560.503-1 (b)(3)(2000)

222.    Plaintiffs and the Class Members repeat and reallege the foregoing paragraphs as though fully set forth herein.

223.    By virtue of the conduct described above, UnumProvident has wilfully caused, directed and/or improperly influenced its subsidiaries to breach, and the insuring subsidiaries have breached, their obligation to maintain reasonable claims procedures in contravention of the proscriptions of ERISA and the regulations promulgated thereunder [29 C.F.R. §2560.503-1(1)(b)(3)(2000)], which prohibits conduct that unduly inhibits or hampers the fair processing of claims.

224.    As a result of the unreasonable claims procedures described above, plaintiffs and the Class Members have been harmed, continue to be harmed, and will be harmed in the future.

225.    As participants, beneficiaries, or assignees in ERISA governed benefit plans, plaintiffs and the Class Members are entitled to appropriate declaratory and equitable relief under ERISA [29 U.S.C. § 1132(a)(3)] to (a) obtain appropriate injunctive relief immediately stopping the offending and egregious practices that are causing ongoing harm to plaintiffs and the Class Members and (b) redress the violations of ERISA[29 C.F.R. §2560.503-1] set forth herein.

226.    Plaintiffs and the Class Members do not have an adequate remedy at law.

WHEREFORE, plaintiffs, on behalf of the Class, pray for judgment as follows:

1.      Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and that plaintiffs are proper representatives of the Class;

2.      Awarding plaintiffs and the Class declaratory relief determining the illegality of the conduct alleged and injunctive relief whereby UnumProvident and its subsidiaries are ordered to immediately cease, in all States of the United States of America, engaging in the offending practices delineated herein;

3.      Awarding plaintiffs and the Class equitable relief whereby UnumProvident and the subsidiaries are ordered to institute, under the supervision of the Court, new, national procedures that are in full compliance with ERISA;

4.      Awarding plaintiffs and the Class equitable relief appointing a receiver and/or special master to serve as a neutral claims adjustor and assume the role of responsibility for responding to, acting upon, and making determinations pertaining to claims by plaintiffs and the Class and to provide a full and fair review, as required by 29 USC §1133(2), of all claims for benefits under the plan that have been denied;

5.      In the alternative, awarding plaintiffs and the Class a permanent injunction enjoining J. Harold Chandler, Thomas J. Watjen, UnumProvident and the insuring subsidiary defendants from serving as claim fiduciaries and an the imposition of a constructive trust over the any trust assets controlled by J. Harold Chandler, Thomas J. Watjen, UnumProvident, and the insuring subsidiary defendants [29 U.S.C. §1109];

6.      Awarding plaintiffs and the Class other appropriate equitable relief;

7.      Awarding plaintiffs and the Class their costs and expenses in this litigation, including reasonable attorneys' fees and expert fees;

8.    Awarding plaintiffs and the Class such other and further relief as may be just and proper under the circumstances.

Dated: February 25, 2004

Respectfully submitted,

 HARWOOD LLP

By: _____
Robert I. Harwood, Esq.
Matthew M. Houston, Esq.
Jeffrey M. Norton, Esq.
488 Madison Avenue
New York, NY 10022
(212) 935-7400

**Lead Counsel For Plaintiffs
In The ERISA Benefits Denial Actions**

**LAW OFFICE OF DAVID M. HOFFMAN**
David M. Hoffman, Esq.
15A New England Avenue
Summit, NJ 07901

**KIRTLAND & PACKARD, LLP**
Michael L. Kelly, Esq.
2361 Rosecrans Ave., 4th Floor
El Segundo, CA 90245-4923

**LEHMANN LAW OFFICES**
Harry V. Lehmann, Esq.
140 Grant Avenue, Ste. 205
P.O. Box 1846
Novato, CA 94948-1846

**WILLIAMS WESTER & HALL**
Scott Williams, Esq.
Michael Milward, Esq.
755 Baywood Drive, Suite 185
Petaluma, CA 94954

41

**QUADRINO & SCHWARTZ, P.C.**
Evan S. Schwartz, Esq.
Richard J. Quadrino, Esq.
666 Old Country Road - Ninth Floor
Garden City, New York 11530

**LAW OFFICE OF JAMES P. STIEHL**
James P. Stiehl, Esq.
#5 Executive Woods Court
Swansea, IL 62226

**KRISLOV & ASSOCIATES, LTD.**
Clinton A. Krislov, Esq.
Jason Stiehl, Esq.
Civic Opera House
20 N. Wacker, Suite 1350
Chicago, Illinois 60606

**ALEXANDER HAWES & AUDET, LLP**
William Audet, Esq.
Michael McShane, Esq.
300 Montgomery Street, Suite 400
San Francisco, California 94104

**SANDALS & ASSOCIATES, P.C.**
Alan M. Sandals, Esq.
One South Broad Street, Suite 1850
Philadelphia, Pennsylvania 19107-3418

**MANSFIELD, TANICK & COHEN, P.A.**
Denise Y. Tataryn, Esq.
1700 Pillsbury Center South
220 South Sixth Street
Minneapolis, Minnesota 55402-4511

**HOLDER & GROVER, P.A.**
Jon Holder, Esq.
70 Deering Street
P.O. Box 4256
Portland, Maine 04101

**GEARHISER, PETERS, LOCKABY,
CAVETT & ELLIOTT, PLLC**

42

Charles J. Gearhiser, Esq.
320 McCallie Avenue
Chattanooga, TN 37402-2007

**Counsel For Plaintiffs In The
ERISA Benefits Denial Actions**

43